# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Milton I. Shadur | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 9671 | **DATE** | 7/18/2002 |
| **CASE TITLE** | First Defense Legal Aid vs. City of Chicago, et al | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. All defendants' motions to dismiss Complaint Count I are denied, while the motion to dismiss Count II is granted. All defendants are ordered to answer Count I on or before August 1, 2002. In the meantime, both because of what has been said in this opinion and because of the issuance of a brief contemporaneous memorandum order that denies plaintiffs' motion for a TRO for the present, this action is set for a status hearing at 9:30 a.m. July 23, 2002. (29-1, 24-1)

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | **Document Number** |
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | JUL 19 2002 | | |
| | Notified counsel by telephone. | | date docketed | 66 |
| | Docketing to mail notices. | | docketing deputy initials | |
| | Mail AO 450 form. | CLERK U.S. DISTRICT COURT | | |
| | Copy to judge/magistrate judge. | | 7/18/2002 | |
| | | 02 JUL 18 PM 3: 50 | date mailed notice | |
| SN | courtroom deputy's initials | | SN | |
| | | date/time received in central Clerk's Office | mailing deputy initials | |

FIRST DEFENSE LEGAL AID, et al.,   )
                                   )
             Plaintiffs,    )
                                   )
     v.                         )     No.  01 C 9671
                                   )
CITY OF CHICAGO, et al.,        )
                                   )
             Defendants.   )

DOCKETED
JUL 1 9 2002

## MEMORANDUM OPINION AND ORDER

This lawsuit presents a collision between (1) the lawyer plaintiffs--not-for-profit legal organization First Defense Legal Aid ("First Defense") and two of its lawyer staff members--who seek to exercise their claimed First Amendment[1] right to represent clients who are held by the police for interrogation purposes (with the police taking the position that the clients are witnesses in crime investigations, not suspects or targets) and (2) a gaggle of other lawyers who urge on behalf of their governmental clients--the City of Chicago ("City"), members of the top echelon in its police department (its Superintendent and four Area Commanders, collectively "Police Defendants") and Cook County State's Attorney Richard Devine--that law enforcement goals entitle them to keep the lawyer plaintiffs and their

---

[1] As always, this opinion adheres to the conventional and convenient (though technically imprecise) practice of referring to the underlying Bill of Rights provisions (which of course impose limitations only on the federal government) rather than to the Fourteenth Amendment (which applies to state actors and has been construed to embody such Bill of Rights guaranties).

clients apart. Indeed, defense counsel are unabashed by the fact that their clients' conduct--in addition to the refusal to permit the lawyer plaintiffs to see their clients when those lawyers arrive at the police station for that purpose--regularly involves nondisclosure to the clients of their lawyers' presence. And the nature of that refusal is exacerbated by the facts that it is often accomplished via affirmative deception on that score, and that State's Attorney Devine's assistants have on occasion misrepresented the state of the law as the basis for instructing the police to bar plaintiffs' access to their clients (just as his assistants handling this litigation have mischaracterized the state of the law before this Court).

Before this opinion turns to the critical constitutional issue, the context in which this litigation arises must be noted. Defense counsel persist in approaching the issue, not in a vacuum but rather in a sterile bubble that ignores the real world considerations that have triggered this lawsuit. In their universe the police are always meticulous in both understanding and implementing a bright line between noncustodial and custodial interrogation: Not only is that line always recognized and adhered to by the police, but every person who is interrogated and is still on the noncustodial side of that line is studiously informed of his or her freedom to leave. Essentially defense counsel say this:

2

Trust us--whenever an individual is in a police station being questioned, the police are always scrupulous about maintaining the distinction between a witness (who is free to leave) and a suspect or target (who is not). Because they always give people who are not just witnesses their <u>Miranda</u> rights, thus assuring them of their constitutional right to counsel, our police clients are free to <u>refuse</u> all access to counsel to those who are simply witnesses.

But the real world that the lawyer plaintiffs confront instead, as demonstrated by the evidentiary hearing on their motion for a temporary restraining order ("TRO"), gives the lie to that sanitized ideal. Instead the "witnesses" whom the police interrogate remain incommunicado in locked interrogation rooms (and sometimes in handcuffs) for extended periods, all the while being told that they don't need lawyers (sometimes coupled with the police withholding from them the fact that lawyers have in fact appeared and are there to see them). Do defense counsel contend with a straight face that someone whose interrogation took place over a period of <u>78 hours</u> (as testified to by one of the plaintiffs without contradiction) had really been given to understand during that protracted period that he was free to leave at any time?

Meanwhile the lawyers who appear at the police station to see their clients are expressly refused--are actually barred from--such access on the stated basis that such clients are just witnesses in an investigation. Yet in fact the evidence included testimony as to a situation in which such a "witness"--handcuffed

3

to a chair, and having been at the police station for over 14 hours--called out of the station's upstairs window, asking his wife (who was outside of the building with one of the plaintiffs) which person out there was his attorney and saying that he wanted an attorney--but the police officers still refused access to the lawyer. And the evidence further confirmed that such refusal of access is no random aberration, but rather a deliberately adopted and enforced policy.

This Court is disinclined to believe in the tooth fairy--to ignore the obvious reality that the climate in which plaintiffs seek to carry out their responsibilities to their clients, as they contend the First Amendment entitles them to do, is not as defendants would portray it. And the obvious potential for abuse in that respect, which defense counsel resolutely ignore in their portrayals, should surely be understood as part of the matrix in which the key constitutional issue of the First Amendment rights of the lawyer plaintiffs is considered.

Now to consideration of defendants' motions to dismiss the Complaint here. In that respect the familiar ground rule is that articulated in Hishon v. King & Spalding, 467 U.S. 69, 73 (1984):

A court may dismiss a complaint only if it is clear
that no relief could be granted under any set of facts
that could be proved consistent with the allegations.
Conley v. Gibson, 355 U.S. 41, 45-46 (1957).

And although a brief in opposition to a motion to dismiss cannot of course take the place of a plaintiff's pleading requirements

(<u>Car Carriers, Inc. v. Ford Motor Co.</u>, 745 F.2d 1101, 1107 (7th Cir. 1984) is the first of a number of Seventh Circuit opinions that set out that teaching), the evidence obtained during the TRO hearing can appropriately serve to illuminate the reading of the Complaint here through the <u>Hishon</u> lens (see, e.g., <u>Jennings v. Emry</u>, 910 F.2d 1434, 1436 n.1 (7th Cir. 1990)).

In this case the TRO hearing has indeed borne out a good deal of the matters alleged in Complaint Count I's ¶¶22 and 23 (a photocopy of which paragraphs is attached to this opinion). Apart from Counts I and II, defense counsel's most recent filings have made the point--quite legitimately--that this action has been narrowed in scope since its inception. Counts VII and VIII were dropped early on, and since then plaintiffs have voluntarily dismissed Counts III, IV and V, recognizing the standing difficulties that faced the constitutional claims that they had sought to assert on behalf of their clients (as contrasted with advancing their own claims in Counts I and II). But while plaintiffs' lawyers have thus demonstrated their capacity to be educable, regrettably defense counsel have not.

Thus defense counsel (including those working for and representing State's Attorney Devine, who surely ought to know better) persist in urging the impermissible notion that only one set of rights is protected by the First, Fifth and Sixth Amendments--that if no claim exists under either the Fifth or the

5

Sixth Amendment, ergo there is no viable claim under the First Amendment. Just which one or more law schools has or have failed in their educational task by enabling their graduates to emerge with such a bizarre understanding (more precisely, a lack of understanding) of the Constitution is unclear--but if any such law school does exist, it might have been expected that the graduates' ongoing practice of law and their hoped-for reading of cases[2] would have dispelled such a fundamental misconception.

### State's Attorney Devine

Despite what has just been said, the submissions filed by State's Attorney Devine's assistants on his behalf repeatedly argue that plaintiffs and their counsel, in urging that this case be viewed from a First Amendment perspective, are seeking to flout--to take an end run around--decisions that deal with the very different questions of the constitutional posture of lawyers' clients in Fifth Amendment and Sixth Amendment terms. Thus the State's Attorney's responsive memorandum on the TRO motion characterizes plaintiffs' invocation of their First Amendment rights as a "stalking horse" that somehow seeks to "overrule" caselaw that defines the rights of clients under the

---

[2] An overly generous assumption? It took this Court's law clerk all of five minutes to locate an example of the obvious proposition that while a case may fail to state a claim under two other provisions of the Bill of Rights (in that case the Fifth and Eighth Amendments), the case will still survive in terms of a First Amendment claim (Babcock v. White, 102 F.3d 267 (7th Cir. 1996)).

Fifth and Sixth Amendments. That is the same false notion that, according to the uncontroverted TRO evidence, one of the State's Attorney's assistants used in refusing one of the lawyer plaintiffs any opportunity to confer with her client.

What the State's Attorney's counsel in this case have succeeded in doing by that kind of insistence on a demonstrably unsound principle of constitutional law is to snatch potential defeat from the jaws of potential victory. If, as appears clear, their position is indeed that they will continue to give bad advice to the police and that they will continue to refuse all contact between plaintiffs and their clients on the strength (more accurately the weakness) of that same misunderstanding of fundamental law, they ought to be barred from so doing. And that is so even though they claim that the State's Attorney has not been shown to violate the law on the premise that his earlier-referred-to assistant, in refusing to permit one of the plaintiffs to see her client, "only" relied on an Illinois Appellate Court case (People v. DeSantis, 319 Ill.App.3d 795, 745 N.E.2d 1 (1st Dist. 2000)) that dealt with a wholly different question under a wholly different constitutional provision. Even more importantly in terms of the sustainability of the Complaint, if there were any doubt as to whether that position represents the policy of the State's Attorney (as contrasted perhaps with the irresponsible act of a single assistant), it is totally

dispelled by the State's Attorney's repeated filings in this case that advance the same position.[3]

It must be remembered that the joinder of the State's Attorney as a defendant is predicated, as Complaint ¶17 makes plain, on his office's responsibility "for advising the City of Chicago about its legal duties in connection with people held[4] for investigation at Chicago police stations." On that score the State's Attorney _is_ the decisionmaker, and the advice that he and his assistants give must take into account the First Amendment right advanced by plaintiffs here, rather than perpetuating the office's current less-than-specious position that relies exclusively on Fifth and Sixth Amendment considerations. In sum, the motion to dismiss filed by State's Attorney Devine must be and is denied.

### Other Defendants

As for the motions to dismiss filed by the other defendants, City's counsel have signed onto and adopted the extensive submissions tendered by counsel for the police top brass--the Police Defendants. This opinion's ensuing determinations as to

---

[3]   It might be wondered whether State's Attorney Devine himself would really advance the unsound contention that has been addressed here--but he has presumptively chosen his lawyers and, like the plaintiff in Link v. Wabash R.R. Co., 370 U.S. 626 (1962), he is stuck with them.

[4]   [Footnote by this Court]  For this purpose "held" is not viewed in the technical sense as limited to custodial status. Instead it covers both custodial and noncustodial interrogation.

8

Police Defendants' motion should therefore be understood as equally applicable to City.

To begin with, Complaint Count II can be addressed in short order. Police Defendants' Reply in Support of Their Motion To Dismiss has it right. Plaintiffs' claim of deprivation of their right to "occupational liberty" fails, because the controlling caselaw rejects such a claim where only part and not all of a person's calling or profession is foreclosed by a defendant's conduct (see, e.g., <u>Conn v. Gabbert</u>, 526 U.S. 286, 291-92 (1999), which distinguishes earlier caselaw based on that precise distinction). Here plaintiffs can concededly continue to represent their clients who <u>are</u> acknowledged by the police to be suspects or targets and who therefore possess their own constitutional rights to counsel. And plaintiffs' further effort to extract a constitutionally protected property interest from various aspects of state law is unpersuasive. Count II is therefore dismissed.

That leaves only Count I for consideration. Police Defendants' opening gun--which asserts a lack of standing on plaintiffs' part based on the doctrine announced in the "chokehold case" (<u>Los Angeles v. Lyons</u>, 461 U.S. 95 (1983))--simply vanishes on examination. Although the principle articulated in that case could well bar a claim advanced by any <u>client</u> of plaintiffs for lack of the client's inability to show

9

the likelihood of recurrence of his or her own injury in the future, here the lawyer plaintiffs are regularly confronted by the police with the no-access-to-client policy about which they complain. And even though as previously stated only the sufficiency of plaintiffs' pleading is being tested at this point, this opinion has already observed that the TRO hearing evidence has confirmed that ongoing confrontation in cards and spades.

As for the substantive First Amendment right asserted by the lawyer plaintiffs, in part Police Defendants commit the same conceptual error as State's Attorney Devine by pointing to Fifth Amendment caselaw and by drawing from that caselaw the false conclusion that "Plaintiffs' argument is directly contrary to established Supreme Court precedent regarding the right to counsel" (Police Defendants' Mem. 13). It is quite true that the application of a lawyer's acknowledged First Amendment right (discussed later) has not been presented for judicial decision in the current context before now. But it must be remembered that this is not an action for damages that might trigger considerations of qualified immunity, but is rather one seeking injunctive relief to which such immunity does not extend (see, e.g., Pulliam v. Allen, 466 U.S. 522 (1984), rejecting even the applicability of absolute judicial immunity where only injunctive relief is at issue). In summary, the argument sought to be drawn

10

from any inapplicability of constitutional provisions other than the First Amendment fares no better coming from the Police Defendants than from the State's Attorney--it is again rejected.

Nor are Police Defendants aided by their repeated arguments that walling off lawyers from their clients at the expense of the former's First Amendment rights is necessary in the interests of law enforcement. Nearly four decades ago Escobedo v. Illinois, 378 U.S. 478, 490 (1964) admonished those who would urge a policy of law enforcement uber alles:

> If the exercise of constitutional rights will thwart the effectiveness of a system of law enforcement, then there is something very wrong with the system.

This Court is secondary to none in its respect for law enforcement, but that horse will not carry the load that Police Defendants seek to make it bear. Plaintiffs' exercise of their First Amendment rights meshes with and promotes their clients' correlative rights under that same Amendment--and not incidentally, it also serves to protect their clients against the kind of pretextual applications of the principles that govern noncustodial interrogation that are regrettably suggested by the evidence during the TRO hearing, and that pose an obvious danger for the reasons expressed earlier in this opinion.[5]

---

[5] Indeed, it is truly disturbing to find those who are supposed to be our pillars of law enforcement urging that allowing people--those who are being asked to cooperate and to provide information--to meet with their lawyers (retained for them by their family members) and be advised as to their legal

11

Just as a client's "right to hire and consult an attorney is protected by the First Amendment's guarantee of freedom of speech, association, and petition" (Denius v. Dunlap, 209 F.3d 944, 953-54 (7th Cir. 2000)), so too the attorney has a First Amendment right to associate with the attorney's clients to further what First Defense describes as its "organizational mission--the social goal of affording protection to indigents in police custody" (Plaintiffs' Amended Response to Defendants' Motions To Dismiss at 9). That right has been validated in NAACP v. Button, 371 U.S. 415, 430, 439 (1962) and revalidated by In re Primus, 436 U.S. 412, 424 (1978), and it is no less strong today.

Although Police Defendants seek to call Ukranian-American Bar Ass'n v. Baker, 893 F.2d 1374 (D.C. Cir. 1990) to their aid, its obvious limitations render it inapplicable to the lawyer plaintiffs' rights here--instead Ukranian-American, id. at 1378, 1381 expressly confirmed the constitutional existence of lawyers' First Amendment rights in those terms and confirmed the entitlement of lawyers to have access even to potential clients (let alone actual clients) "free from governmental interference." Nor does Haitian Refugee Ctr., Inc. v. Baker, 953 F.2d 1498 (11th

---

rights represents an invariable threat to the interests of law enforcement, such as to justify a blanket prohibition against such meetings. And it is doubly disturbing to find defense counsel, who of course would not dream of seeing their clients deprived of their advice and representation, espousing that mindset with such vigor.

12

Cir. 1992) bear on this case, for its special

circumstances--involving aliens detained in government custody

outside of the United States (id. at 1512-13)--render it wholly

inapropos as a barrier to plaintiffs' First Amendment claim.

In short, Police Defendants' Motion To Dismiss Count I (and

hence the piggyback motion of City) does not deserve a better

fate than State's Attorney Devine's.  It too is denied.

### Conclusion

All defendants' motions to dismiss Complaint Count I are

denied, while the motion to dismiss Count II is granted.  All

defendants are ordered to answer Count I (the Complaint's sole

surviving count) on or before August 1, 2002.  In the meantime,

both because of what has been said in this opinion and because of

the issuance of a brief contemporaneous memorandum order that

denies plaintiffs' motion for a TRO for the present, this action

is set for a status hearing at 9:30 a.m. July 23, 2002.


_____
Milton I. Shadur
Senior United States District Judge

Date:  July 18, 2002

13

interrogation; (4) the right not to be deceived into falsely believing that legal counsel is not

immediately available; and (5) the right to have law enforcement officers refrain from deceiving

the lawyer about the client's whereabouts and about whether he is being interrogated.

22.     The City of Chicago, in cooperation with the Cook County State's Attorney, both

acting under color of state law, has established a policy, practice, or custom of denying plaintiffs

and their clients the right to associate with and have access to each other when the clients are

being held at Chicago police stations for investigation of high-profile cases or other crimes that

the police deem of particular seriousness.

23.     In furtherance of this policy, the defendants employ the following tactics in

dealing with FDLA lawyers and their clients when the clients are in custody or restrained of their

liberty at Chicago police stations.  The tactics are used so frequently that they constitute an

official policy of the City of Chicago:

a.     <u>Claiming clients are witnesses held voluntarily</u>.  Chicago police officers refuse

to allow FDLA lawyers access to clients on the ground that the clients are not

entitled to lawyers because they are merely witnesses being held voluntarily,

when in fact the clients are held against their will and may be suspects.

b.     <u>Denying information about clients' whereabouts</u>.  When FDLA is retained to

represent someone by a family member, the FDLA lawyer immediately calls

police area headquarters to learn where the person is being held.  Chicago police

officers deny FDLA information about the clients' whereabouts by (1) refusing to

say where the client is located, (2) providing information only after several phone

calls, or (3) providing misleading or false information.

c.     <u>Denying prompt access to clients at police stations</u>.  When the FDLA lawyer

arrives at the police station where the client is located, Chicago police officers

refuse to allow the lawyer to see the client promptly. Instead, the lawyer sometimes waits many hours before being granted access to a client, while the police use the time to question the client outside the lawyer's presence.

d.  **Denying private meetings of reasonable length and frequency**. Chicago police officers refuse to allow FDLA lawyers to meet alone and in private with their clients. Instead, police officers either force lawyers to interview clients in the lockup, a public area where police officers are present, or provide a separate room but require the lawyers to allow police officers to be present during the interviews. They also refuse to allow meetings for as long or as frequently as is necessary, sometimes limiting meetings to three minutes and sometimes disallowing more than a few meetings even when the client is detained for several days.

e.  **Continuing questioning after client has requested an attorney**. Chicago police officers and assistant State's attorneys continue questioning a client after the client has invoked his right to remain silent and has requested an attorney and FDLA has notified defendants that they represent the client. The questioning continues even after the FDLA lawyer has provided a written Declaration of Rights ("DOR") signed by the client notifying the Police Department and the State's Attorney that the client is exercising his rights to remain silent and to assistance of counsel and, in particular, that he does not wish to speak to any assistant State's attorney or police officer and that he is being represented by FDLA.

f.  **Questioning after Declaration of Rights is signed**. When FDLA provides the police with a DOR signed by the client, Chicago police officers and on-duty

assistant State's attorneys demand to interview the client alone before "accepting" the DOR. In addition, when alone with the client the assistant State's attorneys sometimes attempt to convince clients to fire FDLA and sometimes question the client about the crime under investigation. Assistant State's attorneys (who do not wear names badges or other forms of identification) on occasion misrepresent their role to the client, saying "I am the people's lawyer" or "I help everyone."

g. **Improperly attempting to cause the client to discharge the lawyer.** Chicago police officers improperly attempt to cause clients to discharge their FDLA lawyers. The methods used include (1) making false, disparaging remarks about the lawyers and FDLA such as "they're a group of terrible lawyers who will get you into trouble" or "they're 2-cent lawyers"; (2) repeatedly questioning clients about their decision to retain the lawyers, and (3) telling clients they do not need lawyers because they are only witnesses.

h. **Using threats and even physical violence against the lawyers.** Chicago police officers use verbal threats and even physical violence against FDLA lawyers to stop them from representing the clients.

i. **Interfering with juvenile clients.** Chicago police officers refuse to allow FDLA lawyers to meet with juvenile clients until a youth officer has arrived, while the police use the time to question the child outside the presence of the lawyer.

j. **Refusing to allow lawyers to represent more than one person and refusing to allow more than one lawyer to visit the client.** In instances where an FDLA attorney represents more than one person at the station, Chicago police officers refuse to allow the lawyer to meet with both clients, claiming that the lawyer has a conflict of interest which the police are entitled to assert by barring contact

8

between the lawyer and client. When an FDLA lawyer attempts to visit a client previously visited by another FDLA lawyer (which occurs when the client is held for a long period), police officers refuse to allow the second lawyer to visit.

k. **Detaining people without probable cause and for unreasonable periods of time.** The police hold FDLA clients in custody at police stations when they do not have probable cause to believe that the person committed a crime. They also hold people for unreasonably long periods without providing a prompt judicial determination that there was probable cause for the arrest.

l. **Refusing to allow licensed law students to represent clients.** When the FDLA representative sent to the police station is a third-year law student (or law school graduate) licensed to practice law under Illinois Supreme Court Rule 711, Chicago police officers, in conjunction with assistant State's attorneys, refuse to allow the law student to meet with the client on the ground that the law student is not authorized to act as an attorney at the police station without an attorney-supervisor present.

24. Among the occasions on which the Chicago Police have employed one or more of the tactics described in the preceding paragraph are the following criminal investigations: (a) at Area Four in late June 2001 in the course of investigating the fatal shooting of Chicago police officer Brian Strouse; (b) at Area Five in late July 2001 in the course of investigating the kidnapping of an elderly man held bound and gagged for 16 hours; (c) at Area One in late July 2001 in the course of investigating a fatal shooting; (d) at Area Four in mid August 2001 in the course of investigating a gang-related shooting of a young child; and (e) at Area Two in mid September 2001, in the course of investigating a robbery and murder committed by offenders impersonating police officers.

9